UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JUSTINO J. ORTIZ,

                              Plaintiff,

          -against-

DEPARTMENT OF EDUCATION OF NYC
("DOE"), *et al.*,
                              Defendants.
-----------------------------------------------------------x
**TOWNES, United States District Judge:**[1]

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ **SEP 1 6 2015** ★
**BROOKLYN OFFICE**

**MEMORANDUM AND ORDER**

11-CV-6027 (SLT) (SMG)

Plaintiff Justino Ortiz, a former New York City public school teacher, brings this action against former New York City Mayor Michael Bloomberg; two former Chancellors of the New York City Department of Education ("the DOE"), Joel Klein and Dennis Walcott; two other high-ranking DOE officials and one of his former colleagues, Yolanda Montas, alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act (the "ADEA") and due process claims under 42 U.S.C. § 1983. On October 18, 2013, defendants moved to dismiss this action, arguing (1) that this case is barred by the terms of a Stipulation signed by plaintiff in December 2009, (2) that plaintiff's employment discrimination claims are time-barred, and (3) that plaintiff's pleading fails to state a claim upon which relief can be granted. The Court, having previously converted the motion to dismiss into a motion for summary judgment pursuant to Rule 12(d) of the Federal Rules of Civil Procedure, *Ortiz v. Dep't of Educ.*, No. 11-CV-6027 (SLT)(SMG), 2014 WL 4955709 (E.D.N.Y. Sept. 30, 2014) ("*Ortiz I*"), and having afforded plaintiff ample opportunity to submit relevant materials, now grants defendants' motion for the reasons set forth below.

---

[1] The Court gratefully acknowledges the assistance of a student intern, Jasmine Khoshnou of Pepperdine Law School, in the preparation of this Memorandum and Order.

## BACKGROUND

The allegations contained in Plaintiff's 57-page Amended Complaint (hereafter, the "Complaint") are summarized in *Ortiz I*. Although familiarity with this prior memorandum and order is assumed, the Court will repeat that summary here for the convenience of the reader.

Plaintiff was born in Puerto Rico and was 67 years old in mid-October 2012, when the Complaint was filed (¶ 101).[2] Plaintiff was first employed as a teacher by the DOE in 2000, and became tenured in 2004 (¶¶ 104, 106). Throughout his career with the DOE, plaintiff taught mathematics to seventh- and eighth-grade students in Brooklyn schools (¶¶ 104-05).

In September 2004, plaintiff began working at IS 171, also called "The Abraham Lincoln School" (¶ 106). At that time, the principal of the school was a Ms. Beckman (¶¶ 107). According to the Complaint, plaintiff's students "always performed better than in other classes in IS 171 and better than in comparable schools on the standardized eighth grade Math Tests" (¶ 109). During his first several years at IS 171, plaintiff was "highly regarded by students, parents[,] faculty and administration" (¶ 107).

In the 2005-2006 school year, a Dominican woman named Yolanda Fustanio began working at IS 171 as a "literacy coach" (¶ 110). Within a year, she became an Assistant Principal and "began to ... take charge of everything" (¶ 111). Soon thereafter, Fustanio "began making the work place [*sic*] intolerable for all the Puerto Rican teachers" (¶ 115), including plaintiff. Fustanio first made changes to plaintiff's schedule to "strain and test his mental and physical limits" (¶ 118). She assigned him to "hall duty" during his only free period, thereby "eliminating his only recuperative, preparation, or administrative ... time during the day ..." (¶¶

---

[2]Numbers in parentheses preceded by "¶" denote paragraphs in the Complaint.

116). She also "arranged for his ... classes to be assigned to 12 different rooms during each week," with "back-to-back classes ... on different floors of the building" (¶ 118).

Although Fustanio allegedly "intended to negatively impact his teaching" by preventing plaintiff from "setting up demonstration materials to be used later in the day" (¶ 121), plaintiff "frustrated Fustanio" by becoming "very efficient" in setting up and taking down his teaching materials, which he carted around the school building (¶¶ 121-22). When plaintiff's "teaching remained outstanding" (¶ 123), Fustanio removed the students who were excelling in plaintiff's course, allegedly to enable her to assert that plaintiff's "teaching skills were deteriorating by comparing the achievement of this year's cohort to prior years" (¶ 124). To counter this ploy, plaintiff obtained the standardized scores of the removed students "so he could calculate his real progress with each cohort he began with in seventh grade" (¶ 125). Plaintiff was subsequently denied access to the standardized test scores of students no longer in his class, purportedly in an effort to prevent him from performing these calculations (¶ 126).

The Complaint does not allege, however, that plaintiff was ever disciplined for declining test scores. Rather, plaintiff faced disciplinary charges based on allegedly fabricated charges of sexual misconduct. The Complaint alleges that defendant Yolanda Montas—who "taught the reading and writing portion of the curriculum to the same students to whom Mr. Ortiz taught Math and Science" (¶ 15)—was integrally involved in the fabrication of these charges. However, the Complaint offers two different versions of Montas' involvement.

The first version alleges that "between approximately January and February, 2008," Montas met with "three to four girls" frequently and "coached [them] to discuss and then write up all the 'bad things' they were told that they could think up to say about Mr. Ortiz" (¶ 15).

3

When she received drafts of the students' statements, Montas "corrected/edited" them and directed the girls to copy the revised versions in their own handwriting (¶ 15; *see* Complaint, p. 1). The final drafts were dated "on or about June 10-11, 2008," and apparently served as the basis for the disciplinary charges (¶ 15).

The second version implies that the girls' statements had their genesis in an incident which occurred during the second week of June 2008, after plaintiff informed a new student, Roccio Corcino, that her grade would be an "incomplete" (¶¶ 140-41). Apparently aware that such a grade would necessitate attendance at summer school, Corcino "flew into a rage, demanded a grade of ninety, said she would get even, and stormed out of the room" (¶ 142). Although "Corcino certainly appeared in a frame of mind that she would welcome venting and spewing whatever hyperbole came to mind or was suggested to her that was detrimental" to plaintiff (¶ 143), plaintiff does not know exactly what happened next. The Complaint states:

> Whether [Corcino] sought out the teacher who had been encouraging her to speak against Mr. Ortiz and then the teacher used her comments to solicit other students to join or whether Corcino took two friends with her to bolster the effect of her vengeance against Ortiz, there is no reason to doubt the allegation that three students approached a teacher, on or about June 10, 2008. Plaintiff can only piece together the actual dynamics of what occurred in retrospect as it was sometime before he learned what was being alleged ... and can only remember Corcino as being a trigger to some students finally acquiescing to the long term urging by, at least, Ms. Montas (¶¶ 144-45).

Eventually, students who were taught Math and Science by plaintiff but other subjects by a Puerto Rican teacher, Ms. Crespo, also made accusations against plaintiff. Plaintiff apparently lacks personal knowledge as to how many of Crespo's students made accusations. The Complaint states only that "it is alleged that four of Montas['] students and six of Crespo's

4

student[s] participated in making the allegations," but that "this assertion is quadruple hearsay in the report" of the Special Commissioner for Investigation for the DOE (the "SCI"), who investigated the allegations (¶ 135; brackets added). Although "Crespo's narrative" of what she claimed to have "'elicited' from the students ... was used to initiate the SCI investigation" (¶ 132), plaintiff asserts that Fustanio either "forced Crespo to allege that a few of her students [made] ... 'bad comments' against Mr. Ortiz," or forced her "to coerce her students" to make the allegations (¶¶ 131-32).

While the students' complaints alleged incidents which "purportedly occurred over the course of the two years during which the students were taught by Mr. Ortiz," the complaints were all allegedly made on or about June 10, 2008, just as Principal Beckman was about to retire (Complaint, p. 2). The SCI "sent out two investigators"—both "retired senior detectives of the NYPD"—who "interviewed the about-to-become Principal Fustanio, but not the actual Principal Beckman" (*id.*). The investigators "accepted ... Fustanio's version of what she was told by the teacher who coached the students to write and then rewrite incorporating the teacher's suggestions [into] their statements to her satisfaction" (*id.*). The SCI then conducted an investigation which, according to the Complaint, was inadequate in many respects (¶ 156).

Defendant Regina Loughran, the First Deputy Special Commissioner for Investigation, then drafted a report which concluded that the charges against plaintiff were "substantiated" (Complaint, p. 2; ¶ 157). The Complaint alleges that Loughran relied, "as she always does," on the "raw notes of the investigators" (Complaint, p. 2). This report formed "the basis for a presumptive finding of 'probable cause' and caused ... [p]laintiff to be taken off the payroll" (¶ 157).

Plaintiff—unaware that he could be represented by the New York State Unified Teachers union (the "NYSUT")—consulted a private attorney (¶ 159). As a result, the NYSUT declined to represent him (¶¶ 160-61). Plaintiff ultimately retained "the most established [N.Y. Educ. Law] 3020-a private counsel" (Complaint, p. 3).

The disciplinary hearing began "several months" after plaintiff was removed from the payroll (¶ 157). The Complaint alleges problems relating to the conduct of the DOE's attorneys during such hearings. According to the Complaint, "[d]iscovery is not complied with ... even when the hearing officer rules that the materials must be turned over" and the DOE suffers no consequences for this failure (¶ 166). In addition, "[t]here is constant prosecutorial misconduct in getting on the record all sorts of testimony that the hearing officer has repeatedly ruled excluded" (¶ 167). When the respondent has exculpatory evidence, "there is unrelenting objection and argument and wearing the arbitrator down" (¶ 168). However, the Complaint does not specifically allege that any of the misconduct identified above occurred in plaintiff's case.

The Complaint also offers a litany of other problems with such hearings. For example, the pleading alleges that the arbitrators who preside over such proceedings are "pronouncedly pro-DOE" because they want to continue to remain on the DOE's "honed ... panel of permanent arbitrators" (¶ 163; ellipsis added); that the arbitrators are "intimidated by the DOE attorneys" (¶ 162); and that "[s]idebars are off the record so there is no evidence of collusion [and] bad faith" (¶ 165). Again, the Complaint does not specifically allege that any of these problems affected the outcome of his hearing. Indeed, an arbitrator did not have to rule in plaintiff's case because in December 2009, plaintiff elected to accept a mid-hearing settlement and resign.

6

The Complaint alleges that plaintiff settled, in part, because of problems with counsel. According to the Complaint, plaintiff fired his attorney during the hearing for "failing to probe glaring contradictions in [an] adverse witness' cross-examination" (Complaint, p. 3). Given only one week to retain new counsel or else proceed *pro se*, plaintiff hired an attorney who "had no appropriate training or experience for the ... 3020-a proceeding but assured plaintiff that he could handle the matter" (*id.*). That attorney was given only two weeks to "prepare to enter mid-trial in a trial that had been on going [*sic*] for several months" (*id.*). "In over his head, ... counsel wrongly advised him to settle[ ] on DOE[']s terms," and, together with the DOE's attorney, "coerced plaintiff to accept a terrible settlement of adhesion which got him absolutely nothing" (*id.*, n. 1).

The Complaint does not allege any facts regarding the settlement negotiations to substantiate the claim of coercion. In addition, the Complaint does not attach a copy of the Stipulation of Settlement itself or describe its terms with any specificity. The pleading states, however, that plaintiff "had to sign that he would not file any action or seek any due process whether for return of his job or even for the pain and suffering that he endured at the wilful actions of ... each of the ... defendants, even unrelated to the termination *per se*" (¶ 203).

### The EEOC Charge and Commencement of this Action

At some point after his resignation, plaintiff, proceeding *pro se*, filed a charge of discrimination with the EEOC (¶ 6). Although the charge alleged race and age discrimination, plaintiff's description of the race discrimination "requested investigation of animus and treatment to [*sic*] Puerto Ricans by Dominicans" (*id.*). Plaintiff alleges that it would have been

apparent to EEOC investigators that "a 'national origin' claim was intended and mistakenly called 'race'" (*id.*).

On September 6, 2011, the EEOC issued a right-to-sue letter (*id.*). The Complaint alleges that "[p]laintiff filed the instant complaint within 90 days" of its receipt (*id.*). However, the pleading specifically alleges that plaintiff received the right-to-sue letter on September 9, 2011 and this action was not commenced until December 9, 2011—91 days later.

On December 12, 2011, plaintiff's counsel, Joy Hochstadt, sent this Court a four-page "Letter Motion for Equitable Tolling," explaining in detail why the complaint was not filed until December 9, 2011. That letter conceded that plaintiff's employment discrimination claims were untimely, but argued that the 90-day deadline should be equitably tolled. Hochstadt represented that plaintiff first contacted her on the day after Thanksgiving, then took "almost a week ... to deliver the executed retainer agreement and retainer check," leaving only a week to submit the complaint. Letter to Hon. Sandra L. Townes from Joy Hochstadt, dated Dec. 12, 2011 (the "Letter-Motion"), p. 1. At the time, Hochstadt was working on submissions for two other cases: an amended petition relating to a 3020-a proceeding, which she needed "to submit immediately," and a motion for summary judgment, which was due on December 9, 2011 (*id.*).

Even though Hochstadt was able to extend the time for filing the motion for summary judgment by 10 days, she "still had very limited time to draft" the complaint in this action (*id.*, p. 2). Hochstadt recognized that she "could ... write a truncated complaint to meet the deadline" for commencing the employment discrimination action, then file a more detailed, amended pleading after the deadline (*id.*, p. 1). However, thinking she might have time to draft a pleading that might not require immediate amendment, Hochstadt resolved to draft "the beginning and

8

end of the complaint first," then add "as many of the factual allegations as [she] would have time for in order to arrive at the Courthouse to stamp the Complaint before midnight" on the day the pleading was due (*Id.*, p. 2).

An alumna of Brooklyn Law School, which is three blocks from the Courthouse in downtown Brooklyn, Hochstadt recalled that it took only 35 minutes to drive from her home/ office to downtown Brooklyn during the morning rush hour in 2001-2004, when she was a law student attending 9:00 a.m. classes (*id.*). Although she expected the trip to take less time late at night, she nonetheless allowed "more than twice ... the 35 minutes" to make the trip (*id.*). However, Hochstadt was unaware that the Brooklyn Bridge was closed at 11:00 p.m., Sunday through Thursday, for construction (*id.*). She was further delayed by unexpectedly heavy traffic (*id.*). Accordingly, she did not arrive at the Courthouse until after midnight and did not place the complaint in the "after hours drop box" until sometime after 12:40 a.m. on December 9, 2011 (*id.*).

Far from truncated, the complaint which Hochstadt filed was 29-pages long, with almost a dozen pages of highly detailed factual allegations. The complaint contained not just two employment discrimination claims—a Title VII claim and an ADEA claim—but also a civil rights claim under 42 U.S.C. § 1983. Aside from plaintiff's employer, the DOE, the pleading named eight individual defendants: Joel Klein, who was Chancellor of the DOE at all times relevant to this action; five other DOE employees (Fustanio, Montas, Weinstein, Europe and Loughran); the NYSUT's General Counsel's Office; and the union's General Counsel, James R. Sandner.

In seeking equitable tolling, Hochstadt characterized the 45-minute delay in filing the complaint as "unavoidable" (Letter-Motion, p. 3). She argued:

> The Court has the power to equitably toll the 45 minutes, because counsel set out allowing 2.5 times as much time as is normally required to reach the Courthouse. Counsel reached the timestamp and drop box at the earliest that was humanly possible, despite having allowed 85 minutes to make a trip that routinely takes 35 minutes in traffic and 20-25 minutes with very light traffic (*id.*, pp. 2-3)

Hochstadt further maintained that the minimal delay did not prejudice defendants, since plaintiff did not expect to serve defendants with process until sometime in February 2012 (*id.*, p. 3). Her Letter-Motion urged the Court to rule on the Letter-Motion *ex parte*, but stated that counsel would serve the Letter-Motion along with the complaint, so defendants could "address this issue in their initial response" (*id.*, p. 4).

In an endorsed order dated February 10, 2012, this Court denied the Letter-Motion as premature. The Court noted that if the DOE sought to dismiss the Title VII claims as untimely filed, plaintiff could "include the argument raised in the instant motion in his opposition papers" (Endorsed Order dated Feb. 10, 2012, and filed Feb. 14, 2014). All defendants, except for Fustanio and Weinstein, then requested, and were granted, permission to file a motion to dismiss. (Order dated June 28, 2012, and filed July 2, 2012).

### The Complaint

On October 16, 2012—after motions to dismiss had been served on plaintiff and shortly before the opposition papers were due—plaintiff filed an amended complaint, which is referred to as the Complaint herein. Like the original pleading, the Complaint alleged three causes of action: employment discrimination claims pursuant to Title VII and the ADEA, and a § 1983

claim. However, unlike the original pleading, the Complaint does not name Fustanio, Weinstein, the NYSUT's General Counsel's Office or the union's General Counsel as defendants, and names two new defendants: Michael Bloomberg, who was the Mayor of the City of New York at all time relevant to this action, and Dennis Walcott, who became Chancellor of the DOE in April 2011.

According to the Complaint, Bloomberg is liable to plaintiff under 42 U.S.C. § 1983 because he introduced a "'bottom-line' 'business model' paradigm to reforming the public schools of NYC" in an effort to reduce the money spent on teachers' salaries (¶ 18). Since cutting the number of teachers drastically would be unacceptable to parents and to the teachers' union (¶ 20), the mayor's goal was implemented by attempting to lower the average teacher's salary (¶¶ 23-25). According to the Complaint, these goals were effectuated by "encouraging retirement, encouraging unpaid leaves, and bringing disciplinary proceedings." (¶ 26).

After taking control of the New York City public schools from the State, the mayor introduced a "business model" which made each principal "essentially an independent entrepreneur" (¶¶ 46-47). The principals could opt for a contract in which they traded tenure for more autonomy and opportunities for incentive pay which could raise their compensation significantly (¶ 45). Under this system, the principals' "own jobs were on the line unless they could reduce teacher salaries and invest expenditures likely to improve student achievement parameters" (¶ 52). Since "the only way to achieve savings to invest in other resources ... is to reduce the payroll" (¶ 52), the "business model" gave principals like Fustanio an incentive to target "the longest tenured, highest paid teachers in the school" (¶ 53). Indeed, the Complaint alleges, upon information and belief, that a principal is awarded a bonus for each teacher

brought up on disciplinary charges (¶ 57). Although plaintiff had only been teaching for eight

school years at the time he was accused of misconduct, the Complaint alleges that plaintiff was

targeted as a result of this "business model" (¶¶ 44, 67).

According to the pleading, Bloomberg "know[s] that this is an unlawful and

unconstitutional 'taking' when applied to tenured teachers who have demonstrated neither

incompetence nor misconduct in the performance of their jobs," but persists in the strategy in

order to keep "taxes low for himself and his confreres" (¶ 64). Defendant Klein, who was the

Chancellor of the DOE at all times relevant to this action, is alleged to have "promulgated

policies that encourage Principals to undermine tenured teachers['] property and liberty interests

in their future employment and pension [in] ... violation of the 14th Amendment ...." (¶ 12).

Specifically, the Complaint alleges that Klein promulgated a policy that enables "Principals ... to

serve as both complaining witness and finder of probable cause in unlawfully bringing ... 3020-a

charges, and then star witness[es] ...." (¶ 1). Although defendant Walcott did not become

Chancellor until April 2011, more than a year after plaintiff resigned, the pleading alleges that

Walcott is "liable for the continuation of the policies" (¶ 14).

Unlike defendants Bloomberg, Klein and Walcott, defendants Loughran and Europe are

alleged to have been personally involved in plaintiff's disciplinary proceedings. Loughran—

First Deputy Commissioner to Richard Conlon, the Special Commissioner of Investigations—

allegedly "drafts and signs each and every report to the Chancellor substantiating or not

substantiating the allegations the SCI has received and investigated of pedagogue misconduct"

(¶ 16). Although the SCI investigators, as retired detectives, are "proficient in writing

investigative reports," Loughran allegedly drafts the reports to make the facts seem "more

12

inculpating than they actually are" (¶ 16), filling in the gaps in the investigators' notes "with hyperbole and exaggeration intended to fire as many educators as possible" (¶ 1). In addition, Loughran's reports confuse and distort the investigators' findings in order to further the mayor's objective of lowering the proportion of tenured teachers (¶ 16).

Like Loughran, defendant Theresa Europe, a Deputy General Counsel to the Chancellor who serves as Director of the Teacher/Administrative Trials Unit, is "personally involved in each case" (¶ 17). She allegedly reviews each case with the supervising and prosecuting attorney she has assigned to it and "directs the approach, methods, and posture, and settlement offers" of the DOE (*id*.). Plaintiff asserts that the attorneys who work under Europe engage in "unethical conduct," such as soliciting cases; "misinform Principals that the Principals should unlawfully arrogate to themselves bringing charges;" and "intimidate supposedly independent hearing officers" (¶ 1).

The Complaint asserts that plaintiff was "coerced" into signing the Stipulation of Settlement which ended his disciplinary hearing "both by pressure to sign and threats of dire non-applicable consequences – and time allocation" (Complaint, p. 4). However, the pleading does not allege that either Loughran or Europe were involved in this coercion. Rather, the Complaint specifically alleges that plaintiff's own attorney, together with the DOE's attorney, "coerced plaintiff to accept a terrible settlement of adhesion ... " (*id*., p. 3, n. 1).

Aside from characterizing the Stipulation as "unconscionable" and a "contract of adhesion," the Complaint suggests two bases for nullifying the Stipulation. First, the Complaint implies that there was no consideration whatsoever for the Stipulation, stating that plaintiff "got ... absolutely nothing" (*id*.) Second, the pleading implies that the DOE breached the agreement.

13

According to the Complaint, "[p]laintiff was told if he resigned he would not lose his license and the charges would be withdrawn" (¶ 35). However, plaintiff was not only placed on the Ineligible/Inquiry list, which precluded him from working in New York City (Complaint, p. 3, n. 1), but was asked by the State Education Department to voluntarily surrender his State license (¶ 37). Plaintiff asserts that the latter "could only happen if the charges were not withdrawn" (¶ 37).

***Defendants' Amended Motion to Dismiss***

On October 24, 2012, this Court entered an order which gave defendants leave to serve an amended motion to dismiss on or before November 30, 2012. That order also directed plaintiff to serve his opposition papers on or before December 31, 2012, and gave defendants until January 18, 2013, in which to serve their reply, if any, and file the fully briefed motion. Although that order was subsequently amended, the briefing schedule was not altered.

In a letter dated December 24, 2012, Hochstadt acknowledged receipt of defendants' motion papers and requested that her time to respond be extended to January 30, 2013. *See* Letter to Hon. Sandra L. Townes from Joy Hochstadt dated Dec. 24, 2012. The Court granted that request. However, the fully briefed motion still had not been filed as of mid-October 2013. Accordingly, on October 18, 2013, the Court entered an order which directed defendants to file their motion papers, any opposition papers which they had received from plaintiff, and their reply on or before October 25, 2013. That order specifically provided: "If the ... Defendants have not been served with opposition papers as of the date of this order, this Court will treat the ... Defendants' motion as unopposed." Order dated Oct. 18, 2013, pp. 2-3.

The defendants immediately complied with that order by filing their motion papers. Those papers consisted of a Notice of Motion dated November 30, 2012; a declaration executed by the defendants' counsel, James L. Hallman (the "Hallman Declaration"), which attached four exhibits; and "Defendants' Memorandum of Law in Support of their Motion to Dismiss the Amended Complaint" (hereafter, "Defendants' Memo").

Defendants' Memo contains three points. The first point argues that plaintiff's Title VII and ADEA claims are time-barred because plaintiff failed to commence this action within 90 days of his receipt of the EEOC's right-to-sue letter. Although a copy of the right-to-sue letter is among the four exhibits attached to the Hallman Declaration, Defendants' Memo does not rely on that document. Rather, the first point principally relies on the Letter-Motion, which conceded that the complaint was untimely and sought to establish a basis for equitable tolling. *See* Defendants' Memo, pp. 9-10.

The second point argues that plaintiff's claims against the defendants are barred by the Stipulation of Settlement executed on December 9, 2009 (the "Stipulation"). In the Stipulation, which is attached to the Hallman Declaration as Exhibit 1, the DOE agreed to "discontinue" the 3020-a charges against plaintiff, to immediately reinstate him to the payroll, and not to take any "further disciplinary action ... related to the charges ...." (Stipulation, ¶¶ 1-2, 5). Plaintiff agreed to "irrevocably retire" on or before February 1, 2010 (*Id.*, ¶ 3). In addition, both parties agreed to "keep confidential, to the extent permitted by law, the terms of [the] ... Stipulation and the ... disciplinary charges" and to "waive their right to make any legal or equitable claims or to institute legal or administrative proceedings of any kind, including grievances, against each

other, or any employee or agent thereof, relating to or arising out of the facts and circumstances of this case except to enforce this Stipulation." (*Id.*, ¶¶ 6, 8).

In the Stipulation, plaintiff expressly affirmed that he "had access to counsel," had "consulted with counsel regarding the terms of [the] ... Stipulation," and had entered into the agreement "with advice and consent." (*Id.*, ¶ 10). Plaintiff also stated that had entered into the Stipulation "freely, knowingly and openly, without coercion or duress" and that he had "voluntarily waived all statutory, contractual or constitutional rights that he may have held in this matter for a hearing in accordance with Education Law $3020-a." (*Id.*, ¶ 9). The Stipulation was executed by plaintiff, the attorney who represented him at the 3020-a hearing, Fustanio and the attorney who represented the DOE at the hearing.

To further establish that plaintiff entered into the Stipulation freely and voluntarily, without coercion or duress, the Hallman Declaration attached as Exhibit 2 a portion of the transcript of the disciplinary hearing in which Hearing Officer Robin Gise discussed the Stipulation with plaintiff. Plaintiff told the hearing officer that he had had an opportunity to discuss the terms of the Stipulation with counsel, and that he had read and understood the provisions of the Stipulation. Hallman Declaration, Ex. 2, pp. 1448-49. Before approving the agreement, the hearing officer expressly asked, "[Y]ou enter into this agreement by your own free will, nobody coerced you to do so?" (*Id.*, pp. 1449-50). Plaintiff responded, "Correct." (*Id.*, p. 1450).

In the third point, Defendants' Memo argues that the Complaint fails to state a claim upon which relief may be granted. First, Defendants argue that plaintiff has not stated a claim under Title VII because the complaint does not allege an adverse employment action, much less

a causal connection between an adverse employment action and plaintiff's protected characteristics. Second, Defendants argue that plaintiff's ADEA claims must be dismissed because plaintiff does not allege that his age was the "but-for" cause of any of the allegedly discriminatory acts. Defendants' Memo also asserts that the allegations in the Complaint "do not plausibly suggest sufficient severity, pervasiveness or discriminatory animus to satisfy the objective prong of the ... test for hostile work environment." Defendants' Memo, p. 21.

Third, defendants argue that the Complaint fails to state a claim under 42 U.S.C. § 1983. Defendants cite to cases holding that the process provided under Education Law § 3020-a exceeds what the Constitution requires, and argue that the only reason that plaintiff did not receive due process was because he voluntarily waived his right to continue the hearing. In addition, defendants argue that none of the six individual defendants named in this action were personally involved in the violation of plaintiff's rights.

***Plaintiff's Motion for Reconsideration***

Shortly after defendants' motion was filed, plaintiff's counsel, Joy Hochstadt, filed two letters attempting to explain her failure to file opposition papers. In the first letter, erroneously dated October 19, 2011, but filed October 21, 2013 (the "First Letter"), plaintiff's counsel represented that the DOE Defendants' attorney, James L. Hallman, never served her with a notice of motion and that she was "advised on good authority, [to] ... wait until [Hallman] realized what he had omitted and corrected his service, or otherwise contacted [her] ...." *Id.* Hochstadt made no attempt to contact Hallman or the Court, in part because she had been unsuccessful in her attempts to contact plaintiff during the seven months between the service of the Amended Complaint and late July 2013. *Id.*, p. 2. In late July 2013, Hochstadt discovered

that plaintiff had failed to answer her mail, e-mail, or telephone calls because of health issues, but still did not contact Hallman or the Court, believing "it was still better to wait for the Court or the Defense" to contact her, so as "to allow [her] client more time to improve." *Id.*

Although the First Letter was docketed as a "Letter Motion for Leave to File Opposition Documents," the letter itself did not specifically request any relief. It concluded:

> [N]ow that Mr. Hallman's motion has been served in its entirely on ECF, it is definitely Opposed by the Plaintiff. I need only review my Opposition papers with my client, add or correct anything that he advises me to change and file those papers as well as serve them on Mr. Hallman at the same time as soon as possible but no later than October 25, 2013 as per the Court's Order to Mr. Hallman, if he had them.

*Id.* The letter suggested that "Hallman might also be granted adequate time to reply" to plaintiff's opposition papers, and offered to produce plaintiff's medical records under seal to substantiate her allegations. *Id.*

Hochstadt's second letter, dated October 28, 2011, but filed on October 28, 2013, and docketed as a "Proposed Motion to Continue for two days" (the "Second Letter"), attempted to explain why no opposition papers had yet been filed, despite Ms. Hochstadt's prior assurances that they could be filed by October 25, 2013. That letter attached an e-mail exchange which implied that plaintiff did not update his counsel regarding changes to his e-mail address, rendering Ms. Hochstadt unable to forward a draft of the opposition papers to plaintiff for his review. In the Second Letter, Ms. Hochstadt represented that she planned to send plaintiff a draft of the opposition papers on October 28, 2013; to receive "changes" from plaintiff by October 29, 2013, and to file the Opposition papers on October 30, 2013.

In a Memorandum and Order dated November 4, 2013, this Court noted that the two letters did not request any relief. The Court also ruled that, even if the letters could be construed as a motion for reconsideration or extension of time, the motions would be denied. Finally, the Court stated, "Unless plaintiff can advance a more convincing basis for reconsideration forthwith, this Court will consider the ... motion to dismiss unopposed and will decide the motion." Memorandum and Order dated Nov. 4, 2013, p. 7.

On November 5, 2013—the day after this Court entered its Memorandum and Order—plaintiff's counsel filed a two-page "letter motion" dated November 4, 2011, stating that plaintiff's opposition papers had "been filed on ECF for Your Honor's reconsideration." Letter to Hon. Sandra L. Townes from Joy Hochstadt, dated Nov. 4, 2011, p. 1 (docketed as Document 30). That letter did not set forth any reasons why this Court should reconsider its prior orders. Rather, it began with two paragraphs in which plaintiff's counsel essentially apologized to the Court, stating:

> I fully understand and appreciate Your Honor's Order of [November 4, 2013]. There is a limit to how much time can be allocated to a motion, no matter what the reason in hindsight. Now that I have that hindsight, I realize that as soon as I heard from my client, I should have informed the Court of the reason, and that not knowing the reason, before that, I could not prejudice Plaintiff's case by reporting that I did not know the reason.
>
> I should have submitted, for *in camera* or public perusal (depending on the content) declaration(s) from Plaintiff's physicians(s), including any further time the matter should have been stayed, so that the Plaintiff could participate.

*Id.*

The rest of the letter discussed evidence which plaintiff's counsel had received from her client. Most of that evidence related to the manner in which SCI conducted its investigation or to events which occurred during the disciplinary hearing. Some of that evidence was contained in voluminous exhibits attached to Hochstadt's Declaration Pursuant to 28 U.S.C. § 1746, which was filed with the two-page letter-motion along with Plaintiff's Memorandum of Law in Opposition to Defense Motion to Dismiss.

In a Memorandum and Order dated September 30, 2014 (*Ortiz I*), the Court denied plaintiff's letter-motion for reconsideration. However, the Court then converted the motion to dismiss into a motion for summary judgment pursuant to Rule 12(d) of the Federal Rules of Civil Procedure. The Court noted that the first and second points raised in Defendants' Memo relied on documents outside the pleadings, and announced that it intended to take into consideration the Letter-Motion, the terms of Stipulation, and the hearing transcripts and other documents attached to the Hallman Declaration. While noting that "[i]t might be possible to take some, or even all, of these documents into consideration without converting this motion to a motion for summary judgment," the Court nonetheless elected to convert the motion in order to "give all parties a reasonable opportunity to present all the material that is pertinent to the issues raised in the first two points of Defendants' Memo." *Ortiz I*, 2014 WL 4955709, at *11.

At Hochstadt's request, the Court twice extended plaintiff's deadline for filing additional materials. In response to the second request, the Court endorsed an order extending the deadline to January 23, 2015, but stating that no further extensions would be granted absent extraordinary circumstances. On January 24, 2015, at 1:05 a.m., Hochstadt electronically docketed a three-page letter dated January 23, 2015, which she characterized as a "Counter Motion for Summary

Judgment." (hereafter, "Plaintiff's Response"). The letter attaches declarations by two other

teachers, Paul Santucci and Brian Salazar, which provide facts relating to their own cases but no

information relevant to this case.

Plaintiff's Response addresses only the issue of whether the Stipulation was coerced, and

not the issue of whether the employment discrimination claims were timely filed. Moreover,

despite asserting that the case is "totally fact based," Plaintiff's Response, p. 1, Plaintiff's

Response fails to provide any evidence that plaintiff was coerced. It first provides a synopsis of

the facts, interjecting several new allegations relevant to the age discrimination which are not in

the pleadings. It then implies that plaintiff was coerced into signing the Stipulation by various

misrepresentations. Specifically, Plaintiff's Response represents that the DOE "asserted" that

plaintiff could "directly retire" and would "retain his teaching license if he 'retired,'" and asserts

that the DOE saves "about $278,000 ... if a teacher resigns prior to or early in the hearings ...."

*Id.*, pp. 2-3. However, Plaintiff's Response does not provide any competent evidence in support

of these representations and assertions. Rather, it (1) states that Hochstadt has requested, but

not yet received, information from the Teacher's Retirement System ("TRS") to support the

assertion that "retirement is something that can only be done with the Teacher's Retirement

System;" (2) asserts, based on Hochstandt's own experience and that of Santucci, that "[e]very

pedagogue brought up on 3020-a charges ... loses their NYC teaching license;" (3) represents

that "the State has been relentless in trying to abrogate the State Certification" of teachers

accused of "sexual impropriety;" and (4) relies on Santucci's declaration for the proposition that

"all the teachers" who took the 3020-a process to completion "earned an additional year's

salary." *Id.*, pp. 2-3.

Since January 24, 2015, the Court has received two additional submissions from plaintiff. The first is a letter dated April 22, 2015, which provides further information regarding Hochstadt's ill-fated trip to the Courthouse on the night of December 8-9, 2011, and details Hochstadt's as-yet-unsuccessful efforts to obtain information from the TRS. The letter attaches, *inter alia*, a declaration from one Deborah White, who states that she and Hochstadt left Hochstadt's office for the Courthouse "no later than 11:10 PM" on December 8, 2011, but due to "unprecedented" traffic, did not arrive until 12:38 a.m. on the morning of December 9, 2011. Declaration of Deborah White, dated Mar. 8, 2015, ¶¶ 3-5. The letter also attaches a proposed subpoena dated April 21, 2015, which commands the TRS to admit "that it is not possible to retire from service as a pedagogue from the City School District of the City of New York without first resigning," and that "direct retirement without prior resignation is not a possibility."

The second submission is a letter dated May 8, 2015. That letter principally attaches for *in camera* review approximately 450 pages of medical records which purport to explain "plaintiff's inability to participate in prosecution of the case for over a year and a half." Letter to Hon. Sandra L. Townes from Joy Hochstadt, dated May 8, 2015, p. 1. These documents— which will be electronically filed under seal, then returned to Hochstadt per her request—reveal that plaintiff has some serious medical conditions, but do not suggest that plaintiff has been comatose or mentally incapacitated for a substantial length of time. The letter also asserts that, although "retirement" from the DOE is "synonymous to receiving a NYC lifelong pension and lifelong health insurance coverage," plaintiff may not have "vested" because he did not work for the DOE for ten years.

## DISCUSSION

### Legal Standards

Although the instant motion was brought as a motion to dismiss, the Court announced in *Ortiz I* that it would treat defendants' first two arguments as seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *Ortiz I*, 2014 WL 4955709, at *11. Under Rule 56, summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotation marks omitted).

Upon a motion for summary judgment, the moving party bears the burden of showing that there is no genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant meets this burden, "the non-movant must set forth specific facts showing that there is a genuine issue for trial." *See Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations and citation omitted). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Id.* at 121 (internal quotations and citations omitted). Moreover, the disputed facts must be material to the issue in the case, in that they "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

23

When evaluating a motion for summary judgment, "[t]he court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "No genuine issue exists if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could not find in its favor." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996). "If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotation marks and citation omitted) (brackets in original).

Since the Court did not convert the third argument raised in Defendants' Memo, that argument will be analyzed under the standard applicable to Rule 12(b)(6) motions. In considering a motion to dismiss pursuant to Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1 (2002). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). If a party has not "nudged [his] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.*

24

*The Stipulation*

The Court will first address the second point raised in Defendants' Memo, which asserts that this entire action is barred by the terms of the Stipulation. In paragraph 8 of that Stipulation, the parties agreed to "waive their right to make any legal or equitable claims or to institute legal or administrative proceedings of any kind, including grievances, against each other, or any employee or agent thereof, relating to or arising out of the facts and circumstances of this case except to enforce this Stipulation." Defendants maintain that this very broad provision bars this action. Plaintiff does not contest that proposition but seeks to invalidate the agreement on various grounds.

A settlement agreement "is interpreted according to general principles of contract law." *Powell v. Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007) (citing *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005)); *Bank of N.Y. v. Amoco Oil Co.*, 35 F.3d 643, 661 (2d Cir. 1994). Since there is no federal statute governing settlement agreements and no federal general common law, "the enforceability of the Stipulation should be determined with reference to state law, and in particular the law of New York, where the Stipulation was signed ...." *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 87 (2d Cir. 2011). In New York, "relief from a stipulation of settlement will only be granted upon a showing of good cause sufficient to invalidate a contract." *Peters v. Peters*, 150 A.D.2d 763, 763, 542 N.Y.S.2d 212, 213 (N.Y. App. Div. 1989); *S.E.C. v. Credit Bancorp, Ltd.*, 232 F. Supp. 2d 260, 265 (S.D.N.Y. 2002) (party can "be relieved from the agreement only where there is cause sufficient to invalidate the contract"). It is, however, "well settled that stipulations of settlement are judicially favored and may not lightly be set aside..." *Twenty Miljam-350 IED Jammers*, 669

25

F.3d at 88 (quoting *In re Guttenplan*, 222 A.D.2d 255, 256-57 (N.Y. App. Div. 1995)). "This is all the more so in the case of 'open court' stipulations ..., where strict enforcement not only serves the interest of efficient dispute resolution but also is essential to the management of court calendars and integrity of the litigation process." *Hallock v. State of New York*, 64 N.Y.2d 224, 230, 485 N.Y.S.2d 510, 512 (N.Y. 1984) (internal citation omitted).

The Complaint in this case alludes to various grounds for invalidating the Stipulation. The Complaint repeatedly asserts that the Stipulation was "coerced," characterizes it as an "unconscionable agreement of adhesion," implies that there was no consideration for the agreement, and asserts that it is unenforceable because the terms were breached by the DOE. However, these allegation do not provide a basis for voiding the Stipulation.

First, a court may not set aside a settlement on grounds of coercion or duress unless these allegations are substantiated by evidence. *See Willgerodt on Behalf of Majority Peoples' Fund for the 21st Century, Inc. v. Hohri*, 953 F. Supp. 557, 561 (S.D.N.Y. 1997), *aff'd sub nom. Majority Peoples' Fund for 21st Century, Inc. v. Hohri*, 159 F.3d 1347 (2d Cir. 1998). Plaintiff has provided no such evidence. Plaintiff himself has not even filed an affidavit stating that he was coerced in any way or offering any description of the negotiations which resulted in the Stipulation. Indeed, plaintiff himself has twice represented that he was *not* coerced. First, by signing the Stipulation, plaintiff represented that he was entering into the agreement "freely, knowingly and openly, without coercion or duress." Stipulation, ¶ 9. Second, when asked by the hearing officer to confirm that he was entering into the Stipulation of his "own free will" and that "nobody coerced [him] to do so," plaintiff answered, "Correct." Transcript of Plaintiff's 3020-a Hearing, pp. 1449-50.

While the Complaint alleges that Plaintiff was coerced "both by pressure to sign and threats of dire non-applicable consequences – and time allocation," Complaint, p. 3, that allegation is not only conclusory, but also fails to allege that the DOE's attorney applied the pressure or made the threats. Indeed, the Complaint states that plaintiff's inexperienced attorney, who was "[i]n over his head" in the § 3020-a hearing, "wrongly advised him to settle[] on DOE terms" and then, together with the DOE's attorney, "coerced plaintiff to accept a terrible settlement of adhesion ... " (*id.*, n. 1). Where a settlement is agreed upon among clients and counsel, the terms are conveyed to the court by counsel and judgment entered accordingly, the judgment may not be set aside on the complaint of one party that his counsel coerced him into agreement. *Gilbert v. United States*, 479 F.2d 1267, 1267 (2d Cir. 1973) (*per curiam*).

Second, the Stipulation was not an "agreement of adhesion." Complaint, p. 3. "A contract of adhesion is a contract formed as a product of a gross inequality of bargaining power between parties." *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) (internal quotations and citation omitted). Typically, these are "standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change any of the contract's terms." *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F.Supp. 826, 831 (S.D.N.Y.1996). "A court will find adhesion only when the party seeking to rescind the contract establishes that the other party used 'high pressure tactics,' or 'deceptive language,' or that the contract is unconscionable." *Klos*, 133 F.3d at 168 (citation omitted).

In this case, there is no evidence that the Stipulation was a result of high pressure tactics or deceptive language. Rather, the Complaint suggests that plaintiff, having improvidently fired

his experienced counsel and facing the prospect of proceeding with an inexperienced attorney, was convinced by his own attorney to settle. The DOE had already devoted considerable resources to the hearing, which had been ongoing "for several months" before the settlement. Complaint, p. 3. There is nothing to suggest that the DOE was suddenly unwilling to take the hearing to its conclusion. To the contrary, the fact that plaintiff had fired his attorney mid-hearing implies that plaintiff was concerned that the hearing was not going well for him.

Third, plaintiff's allegation that the Stipulation was unconscionable rests solely on proof that the agreement was lopsided. Complaint, p. 3. According to the Complaint, plaintiff "would have gotten ... at least six months more salary and an additional 6-9 months of pension credit" had he not settled. Complaint, ¶ 199. The DOE, on the other hand, allegedly saved "at least ... $20,000.00" in arbitrator's fees, "another $10,000.00" in attorney's fees, and other expenses. Complaint, ¶¶ 200-01. Focusing on these pecuniary considerations, plaintiff characterizes the Stipulation as an "unconscionable agreement that gained the DOE everything and the Plaintiff nothing" and urges the Court to set it aside. Complaint, ¶ 198. In addition, the Complaint implies that the Stipulation lacked consideration, stating that it "was an invalid contract because [plaintiff] received nothing in return." Complaint, ¶ 204.

Even assuming that plaintiff's numbers and assertions are true, proof that the agreement was lopsided would not provide a basis for voiding the agreement. "[A] bad bargain, even a terrible bargain, is not *ipso facto* substantively unconscionable." *VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 532 (S.D.N.Y. 2013). Under New York law, "[a] determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of

meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10, 537 N.Y.S.2d 787, 791 (N.Y. 1988) (internal quotations and citations omitted). "[E]ven a seemingly lopsided bargain is rarely enough, on its own, to void a contract's terms. It is only in 'exceptional cases where a provision of the contract is so outrageous' that a contract might be rendered 'unenforceable on the ground of substantive unconscionability alone.'" *Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC*, 832 F. Supp. 2d 194, 202 (E.D.N.Y. 2010) (quoting *Gillman*, 73 N.Y.2d at 12).

In this case, the Stipulation was not outrageous. Even assuming that the Stipulation was not in plaintiff's short-term financial interests, plaintiff's argument ignores the non-pecuniary benefits of settling. According to the Complaint, plaintiff was accused of sexual misconduct by not just one, but several, middle-school girls. By entering into the Stipulation, plaintiff avoided the very real possibility of being terminated for this abhorrent behavior. Given public attitudes towards pedophiles, this sort of termination would have been extremely humiliating and stigmatizing. Moreover, since many employment applications ask if the applicant has been terminated and for the circumstances of the termination, this result would have seriously jeopardized his chances of finding substantial employment in any field, much less in education. The argument that the Stipulation was unconscionable is, therefore, entirely without merit.

In light of the considerable non-pecuniary benefits of settling, plaintiff's claim that he "received nothing" by signing the Stipulation rings hollow. However, even if there were no consideration for the agreement, plaintiff's claims would be barred by § 15-303 of the New York General Obligations Law. This statue provides that "[a] written instrument which purports to be

a total or partial release of all claims ... or a total or partial release of any particular claim ... shall not be invalid because of the absence of consideration ..." N.Y. Gen. Oblig. Law § 15-303 (McKinney 2010), *see also Twenty Miljam-350 IED Jammers*, 669 F.3d at 88 (finding that no consideration was needed for a stipulation barring future related claims against the Government).

Finally, plaintiff implies that the DOE breached the terms of the Stipulation, rendering the agreement unenforceable. The Complaint alleges that "[p]laintiff was told if he resigned he would not lose his license and the charges would be withdrawn," Complaint, ¶ 35, and that "[t]he DOE falsely promised that if he resigned that he would not be resigning with charges pending to prevent him from obtaining future work." *Id.*, ¶ 207. Similarly, Plaintiff's Response represents that the DOE "asserted" that plaintiff could "directly retire" and would "retain his teaching license if he 'retired,'" Plaintiff's Response, pp. 2-3. Plaintiff claims that these representations were false because he not only remained on the Ineligible/Inquiry list, which precluded him from teaching in New York City, but was asked by the State Education Department to voluntarily surrender his State license. Complaint, ¶ 37. Plaintiff asserts that the latter "could only happen if the charges were not withdrawn." *Id.* In addition, Plaintiff's Response asserts that no one can "directly retire," because "retirement is something that can only be done with the Teacher's Retirement System." Plaintiff's Response, pp. 2-3.

None of plaintiff's allegations make out a violation of the terms of the Stipulation. First, the Stipulation itself does not mention plaintiff's teaching licenses, much less provide that plaintiff would keep said licenses if he retired or resigned. Moreover, it cautioned:

> This written agreement contains all the terms and conditions
> agreed upon by the parties and no other agreement, oral or
> otherwise, regarding said charges shall be deemed to exist or to
> bind any of the parties hereto or to vary any of the terms contained
> herein.

Stipulation, ¶ 13. Accordingly, even if the DOE's attorney made oral representations to plaintiff

regarding his licenses, the Stipulation made it clear that such oral agreements would be

unenforceable.

Second, under the terms of the Stipulation, it was *plaintiff* who agreed to irrevocably

retire. The Stipulation made no mention of pensions, and did not dictate what actions plaintiff

would have to take satisfy the TRS. Even assuming plaintiff could establish that he was unable

to take those actions, this proof would not establish that the DOE breached the contract.

Third, under the terms of the Stipulation, the DOE agreed "that no further disciplinary

action will be taken ... related to the charges preferred." Stipulation, ¶ 5. That language

precluded further disciplinary action, but did not provide that charges against plaintiff would be

sealed or that he would be removed from the Inelligible/Inquiry list and returned to the

classroom. In addition, since only the DOE was a party to the Stipulation, that document did not

preclude the State Department of Education from filing charges of its own. Accordingly,

plaintiff's allegations, even if true, do not establish that the DOE violated the terms of the

Stipulation.

### Title VII and ADEA Claims

Even if the Stipulation did not preclude this action, both employment discrimination

claims would be untimely. In order to be timely, a claim under Title VII or the ADEA must be

filed within 90 days of the plaintiff's receipt of a right-to-sue letter. *See* 42 U.S.C. § 2000e-

5(f)(l) (governing Title VII claims); 29 U.S.C. § 626(e) (governing ADEA claims). "The ninety (90)-day limitation period ... 'is not merely a suggestion; it is a statutorily-imposed requirement necessitating strict adherence ....'" *Cohn v. KeySpan Corp.*, 713 F. Supp. 2d 143, 155-56 (E.D.N.Y. 2010) (quoting *Celestine v. Cold Crest Care Ctr.*, 495 F. Supp. 2d 428, 432 (S.D.N.Y. 2007)). To be sure, "[t]he filing deadline ... is not jurisdictional and, like a statute of limitations, is subject to equitable tolling." *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003). However, "in the absence of a recognized equitable consideration, the court cannot extend the limitations period by even one day." *Johnson v. Al Tech Specialties Steel Corp.*, 731 F.2d 143, 146 (2d Cir. 1984) (quoting *Rice v. New England Coll.*, 676 F.2d 9, 11 (1st Cir. 1982)).

In this case, plaintiff concedes that he received the right-to-sue letter on September 9, 2011, but did not commence this action until December 9, 2011—91 days later. Nonetheless, he argues that the 90-day deadline should be equitably tolled. Equitable tolling, however, applies "only in rare and exceptional circumstances, where it is necessary as a matter of fairness." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 801 (2d Cir. 2014) (internal quotations and citation omitted). Generally, "[t]o qualify for equitable tolling, a plaintiff must show '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in the way'" and prevented the timely filing of the complaint. *Id.* (quoting *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011)). "One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984). "[T]he principles of equitable tolling

... do not extend to what is at best a garden variety claim of excusable neglect." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990).

Plaintiff's argument for equitable tolling in this case is, at best, a claim of excusable neglect. When Plaintiff's counsel received plaintiff's retainer agreement and check, she had a week to submit the complaint. Although she had two other submissions which she needed to complete that week, plaintiff's counsel undertook to represent plaintiff, recognizing that she "could ... write a truncated complaint to meet the deadline" for filing the complaint, then file a more detailed amended pleading after the deadline. Letter-Motion, p. 1.

When she obtained an extension of time with respect to one of the two other submissions, however, plaintiff abandoned the idea of filing a truncated pleading. Rather, she embarked on a riskier strategy: drafting "the beginning and end of the complaint first," then adding "as many of the factual allegations as [she] would have time for in order to arrive at the Courthouse to stamp the Complaint before midnight" on the day it was due. *Id.*, p. 2. Having made the drive to downtown Brooklyn on many a morning between 2001-2004, plaintiff's counsel expected that the late night drive would take less than 35 minutes. Plaintiff claims she allowed "more than twice ... the 35 minutes" to make the trip, *id.*, though Deborah White, who accompanied her on the trip to the Courthouse, recalls only that they left the office "no later than 11:10 PM." Declaration of Deborah White, dated Mar. 8, 2015, ¶ 3.

Regardless of whether plaintiff's counsel left her office 50 minutes before midnight or more than 70 minutes before midnight, it is undisputed that she cut the time much too close. She encountered traffic delays owing, in part, to a scheduled closure of the Brooklyn-bound lanes of the Brooklyn Bridge. Although plaintiff's counsel had virtually never experienced such

33

delays in reaching Brooklyn, and although White characterizes the traffic they encountered as "unprecedented," construction-related traffic jams in New York City are, unfortunately, not extraordinary or unforeseeable.

Even assuming, *arguendo*, that the traffic that was extraordinary and unforeseeable, that traffic alone did not cause the complaint to be untimely filed. The primary cause was plaintiff's counsel's decision to risk delaying the filing to the last minute, rather than following her first instinct to file a truncated complaint and amend it later. If one were generous, one might characterize that decision as excusable neglect. However, excusable neglect is not a basis for equitable tolling. *Irwin*, 498 U.S. at 96. Since plaintiff has not established a basis for equitable tolling and since plaintiff concedes that the complaint was filed more than 90 days after he received the right-to-sue letter, plaintiff's Title VII and ADEA claims are untimely. *See Johnson*, 731 F.2d at 146 ("in the absence of a recognized equitable consideration, the court cannot extend the limitations period by even one day.").

### The § 1983 Claims

Having concluded that plaintiff's first two causes of action are time-barred, the Court now turns to the third cause of action, which alleges § 1983 claims against the six individual defendants. In order to maintain a § 1983 action, a plaintiff must allege both that the conduct complained of was "committed by a person acting under color of state law" and "deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). Moreover, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.

1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Plaintiff

cannot base a defendant's liability on *respondeat superior* or on "linkage in the ... chain of

command." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).

Plaintiff's third cause of action alleges three types of due process claims. First, it alleges

that plaintiff's procedural due process rights were violated because he was coerced into

abandoning the 3020-a hearing. As discussed above at pp. 26-27, *ante*, plaintiff's allegations do

make out coercion. Accordingly, this due process claim is entirely without merit.

Second, the third cause of action advances a "defamation plus" claim, more often

referred to as a "stigma plus" claim. *See Algarin v. Town of Wallkill*, 421 F.3d 137, 138 n. 1

(2d Cir. 2005). "[A] stigma-plus claim ... involves an 'injury to one's reputation (the stigma)

coupled with the deprivation of some "tangible interest" or property right (the plus), without

adequate process.'" *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006) (quoting

*DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003)). To state a such a claim, "a plaintiff

must allege two elements: (1) 'the utterance of a statement sufficiently derogatory to injure his or

her reputation, that is capable of being proved false, and that he or she claims is false,' plus (2)

'a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.'"

*Balentine v. Tremblay*, 554 Fed. App'x 58, 60 (2d Cir. 2014) (summary order) (quoting

*Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004)) (internal citations and quotation

marks in *Sadallah* omitted). However, the "statement must be sufficiently public to create or

threaten a stigma." *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005).

Moreover, "[b]ecause stigma plus is a species within the phylum of procedural due

process claims, ... it is not enough that the plaintiff has demonstrated the deprivation of her

35

liberty interest; ... the plaintiff also must demonstrate that her liberty was deprived without due process of law." *Segal*, 459 F.3d at 213. "[T]he availability of adequate process defeats a stigma-plus claim." *Id.* (citing *DiBlasio*, 344 F.3d at 302); *see also Valmonte v. Bane*, 18 F.3d 992, 1002 (2d Cir. 1994) (even where the plaintiff demonstrates that the government has implicated her liberty interest, she "still must show that the procedural safeguards of her interest established by the state are insufficient to protect her rights").

Although the third cause of action is not entirely clear, the only allegedly stigmatizing statements mentioned in the Complaint are the charges brought against plaintiff. The Complaint does not allege, however, that the charges were made public or were sufficiently public to create a stigma. For that reason alone, the Complaint fails to state a stigma-plus claim. *See Ingber v. N.Y.C. Dep't of Educ.*, No. 14-CV-3942 (JMF), 2014 WL 6888777, at *3 (S.D.N.Y. Dec. 8, 2014) (public school teachers did not adequately plead a "stigma-plus claim" where the complaint failed to allege that "the allegedly false probable cause statement and charges—all of which are part of an internal disciplinary process and recorded in Plaintiffs' internal files—were made 'sufficiently public.'").

Even assuming the charges were sufficiently public, there was no state-imposed alteration of plaintiff's status in this case. Plaintiff was not terminated, but resigned. Moreover, adequate process, in the form of a 3020-a hearing, was not only available to plaintiff, but was afforded to plaintiff. Accordingly, even if the Complaint adequately alleged that the charges against plaintiff were sufficiently public, the Complaint would not state a stigma-plus claim.

The third type of due process claims suggested by the third cause of action is a substantive due process claim. "To state a substantive due process claim, a plaintiff must plead

36

that (1) 'a constitutionally cognizable property interest is at stake,' and (2) the defendant's alleged actions depriving her of that right were 'not merely incorrect or ill-advised,' but 'arbitrary, conscience-shocking, or oppressive in the constitutional sense.'" *Finn v. Anderson*, 592 Fed. App'x 16, 19 (2d Cir. 2014) (summary order) (quoting *Ferran v. Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006)). While the Complaint alleges that it "shocks the public conscience and will ... outrage the public" "[f]or government officials to behave and conduct themselves in the manner" alleged in the pleading, Complaint, ¶ 258, the allegations of the Complaint do not suggest a viable substantive due process claim against the government officials and other high-ranking DOE personnel. Indeed, faced with allegations of sexual misconduct from several middle-school girls, the public would have been much more shocked and outraged had the government officials failed to bring charges.

Even if the Complaint stated a due process claim, none of the individual defendants were personally liable for the due process violations. Although defendants Bloomberg and Klein allegedly created policies that encouraged principals to bring disciplinary charges against tenured teachers, the Complaint does not allege that they had anything to do with the disciplinary charges against plaintiff. Moreover, they are not alleged to have coerced him into abandoning the 3020-a hearing. Defendant Walcott also had no involvement in plaintiff's case since he did not even become Chancellor until April 2011—two months after plaintiff retired.

Defendant Montas is alleged to have participated in the fabrication of the charges against plaintiff, but was not involved in the due process violations. Similarly, defendant Loughran is alleged only to have used hyperbole and exaggeration in the drafting of the charges against plaintiff, but was not involved in the hearing itself. Finally, while defendant Europe is alleged to

have been "personally responsible for having her staff present and promote a settlement in which the DOE got everything and ... [p]laintiff received nothing," Complaint, ¶ 198, Europe's liability under § 1983 cannot be based on *respondeat superior* or on "linkage in the ... chain of command." *See Hernandez*, 341 F.3d at 144.

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the Complaint in this action is granted in its entirety. The Clerk of Court is directed to enter judgment in favor of defendants. Before closing this case, the Clerk of Court (1) shall file under seal, as an attachment to Document 40, those medical records submitted to the Court along with the Letter to Hon. Sandra L. Townes from Joy Hochstadt dated May 8, 2015, then (2) return those medical records to Ms. Hochstadt by registered mail, return receipt requested.

**SO ORDERED**.

/s/ Sandra L. Townes
SANDRA L. TOWNES
United States District Judge

Dated: September *15*, 2015
Brooklyn, New York